IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDRE TRAVERS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-23-3179 |
| BUNN, LIEUTENANT, et al., | * | |
| Defendants. | * | |

\*\*\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Lieutenant Bunn and Sergeant Adelowo's[1] (collectively, "Defendants") Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.[2] (ECF No. 12). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motion, construed as one for summary judgment.

---

[1] The Clerk shall be directed to amend the docket to reflect the proper spelling of Defendant Adelowo's last name to conform to the caption herein.

[2] Also pending before the Court is self-represented Plaintiff Andre Travers' Motion in Opposition to Defendants' Motion for an Extension of Time. (ECF No. 11). This opposition was filed after Defendants' Motion for an Extension of Time to respond to Travers' complaint had already been granted. (February 20, 2024 Order at 1, ECF No. 10). Additionally, the Court granted Defendants' Motion for good cause. Federal Rule of Civil Procedure 6(b)(1) establishes that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires[.]" "The rule's requirements are quite flexible, and the district judge enjoys broad discretion to grant or deny an extension[.]" 4B C. Wright & A. Miller, Federal Practice and Procedure § 1165 (4th ed.). Travers' Motion (ECF No. 11) will be denied as moot.

## I.    BACKGROUND

### A.    Travers' Allegations

Self-represented Plaintiff Andre Travers is a state prison inmate presently housed at the North Branch Correctional Institution in Cumberland, Maryland. (Compl. at 1, ECF No. 1).[3] He alleges that on January 13, 2023, while housed at Jessup Correctional Institution ("JCI"), Sergeant Adelowo and Lieutenant Bunn refused to take action in regard to his medical complaints of chest pain and vomiting blood and subsequently were involved in an excessive use of force against him. (Id. at 2–5).

Travers explains that he informed Adelowo of his medical needs, and he was told that an escort was coming to take him to the medical department, but no escort ever came. (Id. at 2–3). At dinnertime, Travers held open the food port to again advise correctional staff of his medical needs, but staff refused to contact medical staff or have him escorted to the medical department. (Id. at 3).

Soon thereafter, the electrical system at JCI failed and power went out "for some time." (Id.). When Bunn did rounds on the unit, Travers told him he was having chest pains and vomiting blood and requested to be taken to the medical department. (Id.). Bunn refused Travers' request. (Id.). Travers then refused an order from Adelowo to close his food slot, and Travers again requested medical treatment. (Id.). Adelowo attempted to "slam" the food port on Travers' hand, and then Bunn said he was leaving and would return with "every" officer and use "every can of mace" on him. (Id.).

---

[3] Citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

By the time Bunn left Travers' cell, multiple prisoners had lit fires, and there was thick smoke on the tier. (Id. at 4). Travers' chest pain worsened, and he had difficulty breathing. (Id.). Bunn returned with Captain Harcum and over 30 additional officers, and Harcum ordered the officers to spray mace inside the cell. (Id.). Officers emptied five cans of mace on Travers while he was locked in his cell, and Travers was hit with mace in his face and torso. (Id.). Bunn and other officers verbally harassed Travers and his cell partner with derogatory statements about their sexual preferences. (Id.). Officers did not follow cell extraction procedures, nor was the incident video recorded. (Id.). Travers and his cell partner "cuffed" up but because there was no electricity it took 15 minutes for officers to manually open the door with a wrench. (Id.). During this period, Travers struggled for breath and vomited blood. (Id. at 5).

After Travers left his cell and was taken down the tier, "some unknown officers" began to strike and slam him to the ground while other officers continued to spray him with mace, including in his mouth. (Id.). Travers, who has a history of a seizure disorder, had a seizure and blacked out. (Id.). When he regained consciousness, he was still being beaten and slammed. (Id.). Travers was taken to the medical department but did not receive treatment because there was still no power, and the computers were not working. (Id.).

B.     **Defendants' Response**

Travers filed a Request for Administrative Remedy ("ARP") regarding the January 13, 2023 incident, which was referred to the Intelligence & Investigative Division ("IID") of the Department of Public Safety and Correctional Services ("DPSCS") to conduct an investigation of the alleged excessive use of force. (IID Investigation at 7, ECF No. 12-2).

Travers' ARP was investigated by IID, in conjunction with ARPs filed by three additional inmates alleging excessive force on that same date by Captain Harcum, Lieutenant Bunn, and Sergeant Adelowo. (Id.).

Regarding Bunn's incident with Travers, the IID concluded that Bunn properly used his OC spray (commonly referred to as "pepper spray") after being authorized by Security Chief Ross to use force to prevent inmates from setting further fires. (Id. at 23). There is no proof, "such as medical documentation, photographic documentation or any verbal interview that any of the force used that night was excessive." (Id.). Further, the IID concluded that Adelowo did not use spray at all during this incident and similarly, there is no proof that he used excessive force against Travers. (Id. at 24).

The IID record includes the Use of Force ("UOF") documents generated at JCI after the incident. (UOF Investigation at 33–148, ECF No. 12-2). On January 13, 2023, at 5:00 p.m., the power went out in the entire prison, and it was determined that the dinner meal would be conducted inside the housing units. (Id. at 43). At 5:45 p.m., Adelowo called Captain Harcum to report that inmates housed on the top tier, Travers and Stansbury, were throwing things from the food slot in their shared cell and starting a fire. (Id. at 66). Travers refused to comply with Adelowo's order to stop his actions and allow his food slot to be secured, and Adelowo extinguished the fire. (Id.). Additional inmates in another cell on the top tier also started a fire and refused to have the slot closed. (Id.). Adelowo extinguished that fire as well and notified Bunn of the incidents. (Id.). Bunn arrived and while speaking to the inmates on the top tier, a third fire was started on the lower tier. (Id.). Bunn notified supervisors of the situation, and Captain Harcum and Lieutenant Addison arrived to

attempt to resolve the issues. (Id.). At this time, the building was totally dark and too full of smoke for prison staff to safely enter and speak with the inmates. (Id.). Adelowo opened the rear door and an outside door to circulate air. (Id.). Photographs provided show tier floors littered with paper and soot. (Id. at 83–96).

At approximately 7:15 p.m., Captain Harcum was notified that a UOF had been authorized by Chief Ross. (Id. at 66). At approximately 8:15 p.m., Bunn, Adelowo, and seven additional officers entered the tier to take the inmates "from their cells to medical." (Id.). Bunn dispersed "a quick burst" of OC spray to the cell of the other inmates setting fires on the tier, and the inmates were removed from their cell and taken to the medical department by two of the officers. (Id.). Bunn then approached Travers' cell. (Id.). Bunn ordered Travers and Stansbury to remove linen from the slot so that it could be secured, but they refused. (Id.). Travers stated that if someone came to the slot he would "shit them down." (Id.). Bunn ordered Travers to move away from the slot, but Travers refused. (Id.). Bunn dispersed "one quick burst" of OC spray towards Travers. (Id.). Travers then backed away from the door and Adelowo cranked the cell door open. (Id.). Stansbury was removed from the cell and escorted to medical by one officer. (Id.). Travers approached the cell door and was placed in handcuffs. (Id.). Once Travers was removed from the cell, he began "kick[ing] wildly," refused to walk, began spitting in the direction of staff, and attempted to kick Bunn. (Id.). Travers was taken to the ground, and leg irons were applied. (Id.). Captain Adebayo escorted Travers to the medical department. (Id.). Bunn proceeded to another cell. (Id.). Power in the facility was not restored until 10:42 p.m. that evening. (Id. at 44).

The UOF reports include Travers' medical records from one date, January 14, 2023, documenting that he was seen the morning following the incident at 9:19 a.m. (Id. at 102–04). Travers reported chest pain, and that on the day before he had been sprayed in his mouth with mace "which had him spitting blood at the time." (Id. at 102–03). On examination, he had no redness, swelling, or bleeding, his vital signs were normal, and respiration was even and unlabored. (Id. at 103). Travers was offered Tylenol and Pepto Bismuth for chest pain but refused them and returned to his housing unit in stable condition. (Id.).

The IID Incident Report reflects substantially the same details provided by the officers as outlined in the Use of Force Reports. (IID Incident Report at 2–25, ECF No. 12-2). Travers reported to the investigator that officers emptied five mace cans into his cell without warning, Bunn and Captain Harcum pulled him out of his cell, and once Travers was out of his cell Captain Harcum sprayed him in his mouth with mace. (Id. at 13). Travers was then slammed to the ground by officers, and neither Bunn nor Harcum intervened. (Id.). Travers stated that there were 15 officers on the tier when the events took place, he did not know who struck him, but "it had to be like five (5) of them that kicked me." (Id.). Travers was brought to the medical unit but not treated. (Id.).

According to the IID Incident Report, Bunn stated that while Travers was being escorted to the steps, he attempted to "kick and spit at the officers." (Id. at 16). Bunn then sprayed mace at Travers' face to prevent him from "assaulting his staff by spitting on them." (Id.). Staff had to take Travers "to the ground" until he stopped resisting. (Id.). Bunn was the only officer who used mace or was in possession of a "fogger" that night. (Id.).

6

Adelowo also stated that Bunn was the only officer using mace. (Id. at 17). Adelowo denied

that Travers ever reported to him that he was having chest pains and vomiting blood. (Id.).

Travers' allegation that mace was used on him by multiple officers was further

investigated. The investigator obtained the Daily Security Equipment Issue Log for January

13, 2023. (Id. at 17). The log confirmed that Bunn was the only officer involved in the use

of force incident to have possession and use of a fogger. (Id. at 17, 116–23). Further, when

Bunn turned his fogger in at the end of the night, the fogger was listed in satisfactory

condition and was not empty. (Id. at 116). The same fogger was also issued out on January

14, 2023, January 15, 2023, January 16, 2023, and January 17, 2023, and was not replaced

until January 23, 2023. (Id. at 17, 124). Three additional foggers were also replaced on

January 23, 2023. (Id. at 124).

The events of January 13, 2023 were not videotaped. (Id. at 21). The investigator

determined that the video cameras were inoperable as were the lights due to the power

outage. (Id.). Further, a handheld video recorder was not used because this was not a

"planned" use of force and instead simply an effort to "stop the inmates from setting fires

on the tier, to secure the door slot, and to provide the inmates with medical attention after

force or OC spray was used on the inmates." (Id.). The investigator concluded:

> The use of force occurred in an unstable environment in which
> the tier was dark, filled with smoke, and lingering fumes from
> the use of a fire extinguisher. Therefore, the reliance of medical
> documentation, and post incident photos were crucial. The
> medical records for each of the inmates indicated that they
> were all taken to the medical unit and had their eyes and face
> flushed indicating that they were treated for OC Spray
> exposure. The medical records did not note any other injuries
> to support the allegations made in the Inmate ARP reports that

the inmates were physical[ly] assaulted by staff. Also, I confirmed that despite Inmate Travers documenting in his ARP that he was not medically treated, that following the use of force by staff, he was escorted to the medical unit for treatment, but he refused/declined medical treatment, as indicated on the form he signed.

Lastly, two inmates were sprayed with mace after they were handcuffed and removed from the cell. Lt. Bunn stated that he sprayed these two inmates because they gave an indication that they were going to spit on an officer, which would constitute as [*sic*] an assault. This investigation deferred back to the medical documentation, photos, and the fact that Inmate Travers denied medical treatment which did not indicate any notable injuries or health issues; therefore, to conclude that Lt. Bunn's use of force on these two inmates is unfounded.

(Id.).

## C.    Travers' Response

Travers asserts that Bunn falsely reported that he did not tell him he was having chest pains and vomiting blood. (Pl.'s Resp. Opp'n Mot. Summ. J. or in the Alternative Mot. Dismiss ["Opp'n"] at 2–3, ECF No. 14; Suppl. Resp. Opp'n Mot. Summ. J. or in the Alternative Mot. Dismiss ["Suppl. Opp'n"] at 1, ECF No. 15). Travers also states that after he left his cell and was on route down the tier, he had a seizure, blacked out, and knows he was kicked by Bunn, Adelowo, and Harcum. (Suppl. Opp'n at 2). He states that the IID investigation documents that three foggers were replaced on January 23, 2023, and he believes this was because they were used on January 13, 2023. (Id.; see also IID Investigation at 124). Travers affirms that "everything [he] say[s] is the truth." (Suppl. Opp'n at 4).

## II.   DISCUSSION

### A.   <u>Conversion</u>

Defendants' Motion is styled as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for Summary Judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See <u>Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court has "'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See <u>Moret v. Harvey</u>, 381 F.Supp.2d

458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. at 247. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

10

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Travers was on notice that the Court might resolve the Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d); see Harrods, 302 F.3d at 244–45. Although Travers has replied to the Motion, he has not asserted that discovery is necessary, and thus the Court will convert the Motion into a motion for summary judgment.

## B.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

11

Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2), (c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259,

265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (quoting Anderson, 477 U.S. at 247).

## C.    Analysis

Defendants argue that: (1) Travers alleges no factual support for his claim that they used excessive force in violation of the Eighth Amendment; (2) Travers failed to adequately allege that Defendants delayed in providing medical care in violation of the Eighth Amendment; and (3) Defendants are entitled to qualified immunity in their personal capacities. (Defs.' Mem. Supp. Mot. Dismiss or in the Alternative Mot. Summ. J. ["Mot."] at 7–15, ECF No. 12-1).[4]

---

[4] Defendants also argue that Travers fails to state a claim against Case Manager Miller. (Mot. at 13–14). This argument is moot, as claims were dismissed against Miller by Order dated December 18, 2023. (Dec. 18, 2023 Order at 3, ECF No. 6). Defendants also assert, without support, that Travers sues them in their "official capacity" and is entitled to Eleventh Amendment immunity from suit. (Mot. at 7–8); see Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100 (1984); see also Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989). Travers clearly brings suit against Defendants for acts taken only in the officers' individual capacity for which they are not immune, and the claim will not be disposed of on immunity grounds. (See generally Compl.); see Hafer v. Melo, 502 U.S. 21, 22 (1991).

### 1.    Excessive Force Claim

The Constitution's Eighth Amendment prohibition against cruel and unusual punishment "protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996), overruled on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam). An officer violates an inmate's Eighth Amendment rights when he subjects the inmate to "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). The excessive force inquiry has two components. The first, "objective component asks whether the force applied was sufficiently serious to establish a cause of action." Alexander v. Connor, 105 F.4th 174, 182 (4th Cir. 2024) (quoting Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019)). Whether force was objectively reasonable turns on "the nature of the force used rather than the extent of any injuries suffered by the plaintiff and requires only a nontrivial use of force." Id. (citing Wilkins, 559 U.S. at 34, 39 (internal quotations omitted)).

The second, subjective component requires the inmate show that the officer acted "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). Whether an officer "acted with wantonness" depends on "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts

made to temper the severity of a forceful response." Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008) (quoting Whitley, 475 U.S. at 321) (internal quotation marks omitted).

As to Defendant Adelowo, Travers' sole allegation pertaining to the use of force is that after Travers refused to close the food slot, Adelowo "attempted to slam the food port on the Plaintiff's hand." (Compl. at 3). Travers did not amplify his allegations against Adelowo's use of force, and the records provided by Defendants do not lend any additional support to this claim. Travers' bare allegation is insufficient to support a claim of excessive force against Adelowo.

As to Defendant Bunn, his use of mace on Travers takes center focus. Bunn claims he sprayed one burst of OC Spray towards Travers causing him to back away from the door, (IID Investigation at 10), while Travers claims that "the officers" emptied five mace cans into his cell, (id. at 13), and that spraying lasted so long that the entire cell was full of mace. (Suppl. Opp'n at 2). Travers further claims he was maced in the mouth, not by Bunn, but by Captain Harcum.  (IID Investigation at 13). Bunn states he did spray Travers in the face to stop him from "assaulting his staff by spitting on them." (Id. at 16). Defendants have provided extensive documentation that only one officer on the unit at the relevant time had a fogger, and that officer was Bunn. (Id. at 17, 116–23). Defendants have also documented that Bunn's fogger was not emptied out, but in fact used multiple additional times on other days before it was empty and needed refilling. (Id.).

As to any additional allegations that an assault took place, the only contemporaneous medical records show that the next day, Travers complained of chest pain, which was a complaint that existed prior to the use of force, and of having been

maced. (Id. at 102–04). No records memorialize any medical visits associated with injury to Travers from use of the OC spray, his removal from the cell, or his transport to the medical department, nor does Travers address any injuries he may have suffered during those events.

Travers has failed to adequately refute the facts and arguments presented in Defendants' Motion. He has not provided or indicated there is evidence to support his claim that the force used against him by Bunn was objectively unreasonable. Travers does not respond to evidence presented that he had started fires on the tier, refused to remove flammable materials from his slot, attempted to spit at officers, or failed to document any injuries he may have suffered. (Suppl. Opp'n at 1–4). Travers primarily questions the record presented without providing evidence to the contrary. (Id.)

Viewing the record most favorably to Travers, no rational trier of fact could conclude that there remains a genuine issue of material fact as to whether the use of force used by Bunn was reasonable. The record evidence demonstrates that there was a power outage, fires set from Travers' cell and the cells of other inmates, and a smoke-filled tier, coupled with Travers' refusal to remove flammable materials and close the food slot. The record shows that given the circumstances, Bunn used the requisite amount of force necessary to remove Travers from his cell and prevent injury to officers.

In sum, the entirety of the evidence, viewed in the light most favorably to Travers, does not support an Eighth Amendment excessive force claim against either Bunn or Adelowo. Summary judgment on the excessive force claim will be granted in Bunn and Adelowo's favor.

16

## 2.    Medical Claim

Travers brings an Eighth Amendment claim against Defendants Adelowo and Bunn for failure to provide him adequate medical care. To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle, 429 U.S. at 106; see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko, 535 F.3d at 241. Objectively, the medical condition at issue must be serious. See Hudson, 503 U.S. at 9 (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

17

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 225 (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as cruel and unusual punishment in order to present a colorable claim") (internal quotation marks omitted).

18

The facts taken in the light most favorable to Travers fall considerably short of establishing an Eighth Amendment violation based on a delay in providing medical treatment. At most, Travers has alleged that prior to the commotion on the tier, Adelowo refused his request to go to the medical department to be treated for chest pain and vomiting blood, and both Adelowo and Bunn again refused his request when the issues on the tier were in full swing. (Compl. at 1–5). Travers was then removed from his cell, while there was still no power in the facility, and taken to the medical department. (Id. at 5). Travers claims he did not receive medical treatment at that time because the electric was off and the computers were down. (Id.). The medical records provided show that the next morning, Travers refused medication for chest pain. (UOF Investigation at 102–04).

With the sparse medical record provided, it is unclear if Travers meets the objective requirement of having had a serious medical need. The only documentation is his complaint of chest pain and vomiting blood. Even assuming that Travers has met the first prong, that he had an objectively serious medical need, he has not met the second prong, of deliberate indifference. He requested medical treatment at a time when there was a power outage, fire and resulting smoke on the tier, and issues related to inmate safety. Travers has not shown that either Adelowo or Bunn inappropriately delayed his transport to the medical department under the circumstances presented. Further, there is nothing in that record to show that any delay in treatment had an adverse effect, demonstrated by the normal findings at Travers' medical examination the next morning and his refusal of any medication.

19

In sum, the entirety of the evidence, viewed most favorably to Travers does not support an Eighth Amendment medical claim against either Bunn or Adelowo. Summary Judgment on the medical claim will be granted in Bunn and Adelowo's favor.[5]

### III.    CONCLUSION

For these reasons, and by separate Order which follows, the Court will grant the Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, (ECF No. 12), construed as a Motion for Summary Judgment, and the Court will deny Travers' Motion in Opposition to Defendants' Motion for an Extension of Time to respond to his Complaint, (ECF No. 11), as moot.

Entered this 4th day of March, 2025.

_____/s/_____
George L. Russell, III
Chief United States District Judge

---

[5] The Court need not reach Defendants argument that they are entitled to qualified immunity in their personal capacities because the Court has already found that they are entitled to summary judgment as to all of Travers' claims. In any event, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (alteration in original) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). To overcome an official's qualified immunity defense, a plaintiff must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Because Travers does not establish a violation of a statutory or constitutional right, he cannot overcome Defendants' qualified immunity defense.